# United States Court of Appeals
## For the First Circuit

No. 06-2647

UNITED STATES,

Appellee,

v.

JOHN E. CURRAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,

Campbell and Stahl, Senior Circuit Judges.

Tamara A. Barney for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Robert Clark Corrente, United States Attorney, and Luis M.
Matos, First Assistant United States Attorney, were on brief for
appellee.

May 12, 2008

**CAMPBELL, <u>Senior Circuit Judge</u>**. Defendant-appellant John E. Curran appeals from a final judgment and sentence entered in United States District Court for the District of Rhode Island following his conviction after a jury trial on multiple counts of wire fraud and money laundering. Curran does not challenge his conviction but rather the court's sentence, claiming his prison term was excessive because the district court incorrectly calculated the dollar value of the loss caused by Curran's fraud and the number of the fraud's victims. Curran also challenges the court's restitution order. We affirm the district court's judgment.

## Background

Curran held himself out falsely as a medical doctor although his only training in the healing arts was in naturopathy, a system of treatment relying on natural remedies. The wire fraud and money laundering charged in the twenty-three-count indictment rested upon his posing as a doctor so as to entice patients into his office where he conducted expensive "diagnostic" tests he was not licensed to perform and frightened patients into purchasing dubious, overpriced treatments. Two counts were dismissed at trial, and the jury convicted Curran on the remaining counts after eight days of testimony and the admission of several hundred exhibits. The district court sentenced Curran to 150 months in prison, in the middle of the Guideline range, stating that Curran

was a "menace" who "took advantage of [the patients'] worst fears" and "preyed" on them for reasons of "greed" as he undertook "a scam of the worst kind." In calculating Curran's base sentence, the court included substantial enhancements based upon the dollar value of the losses suffered by the victims of his fraud and their number, using as the measure of loss the fees his clients had paid him. The court also ordered Curran to pay restitution of these fees, totaling $1,425,061.62. This appeal followed.

**Facts**

Curran, a high school graduate who had previously run a carpet cleaning business, became a practitioner of naturopathy in 1998. He had trained under a practicing naturopath for two years and completed a two-week program at a college of naturopathic medicine in Arkansas. He maintained an office first in Cranston, Rhode Island and then in nearby Providence. Although he had never attended medical school and did not have a license to practice medicine, he held himself out to clients as being a medical doctor as well as a naturopath. Rhode Island law prohibited Curran from holding himself out as a licensed physician and from diagnosing disease or treating it.

At his office, which gave the illusion that it belonged to a medical professional, Curran wore a lab coat with a name tag reading, "John Curran, N.D., M.D., Ph.D." In the printed materials he passed out to clients, including business cards, prescription

pads, and pamphlets, Curran referred to himself as an "M.D.," "N.D.," "physician," "doctor," and a medical school graduate. Just as he had not earned an M.D., he had also not earned a Ph.D. The sign on Curran's office door read, "Dr. Curran's Office." The nameplate on his desk said, "John Curran, ND, MD, Board Certified Naturopath." Diplomas and certificates bearing his name were framed on the walls, including one from an unaccredited medical school Curran had never attended, and one referring to the purported Ph.D. In a written statement describing the mission of his office, he said, "GET THEM IN THE DOOR! (w/o looking like a huxster [sic])." Curran claimed he had cured people of, inter alia, cancer, liver failure, hepatitis C, paralysis and infertility. Staff were instructed to tell prospective clients that the office had an eighty percent success rate.

When new clients came to see him, Curran would perform a preliminary consultation in which he explained his services. Curran and his staff would ask what he called "open ended diagnostic sounding questions" to emphasize the allegedly medical nature of the discussion. Curran would then charge $950 for a "full-body assessment," which consisted of measuring the client's body heat using a thermal imaging device, hooking each one up to a "BioMeridian Stress Assessment Device" which Curran claimed evaluated the client's internal organs but which is not approved for diagnosing disease, and finally, testing the client's blood by

using a microscope attached to a computer. State and federal authorities had warned Curran that he was not allowed to perform such blood tests because he lacked the proper credentials, and Curran had promised in writing to stop using the procedure. He did not do so. Curran testified at trial that while before the warning he had performed a one-to-two hour live blood analysis, after the warning he switched to performing a shorter, fifteen-minute "live blood demonstration" he felt he was permitted to conduct. He conceded that he had not confirmed such authorization with the Rhode Island Department of Health.

There was testimony by former patients that, after doing the tests, Curran told them that they were in very ill health. He said to them that they had blood abnormalities including live parasites, double-headed parasites, worms, holes, big eggs, green-tinted cells, red crystals, dying cells, "dormit cells," severely reduced blood cells, and/or no white blood cells. He also purported to diagnose deficient body functions or immune systems, "fungus on the liver," defective lungs and kidneys, or "organs in distress." On occasion he indicated the existence or possibility of the existence of a life-threatening illness like cancer. One doctor testified that Curran's records of the results of some of these tests were "gibberish." A doctor testified at trial that while parasites can on rare occasions be found in the blood, such cases are extremely unusual.

There was evidence indicating that Curran's technique included scaring his clients, telling one young woman that "at the rate she was going, she wouldn't live until 25," and telling another woman that her "immune system was completely shot" and that "within a couple of months [she] could be dead." Having scared the clients, Curran offered expensive treatments to them, telling them, "You can't put a price on health." Curran offered "green drink," which he claimed was a nutritional supplement he had invented, containing "a synergistic blend of all natural compounds that support and promote the body's overall ability to fight and prevent diseases." Though Curran sold this item in buckets priced at $600, $1,000, and $2,000, it was a commercially produced liquid that usually sold for only a small portion of Curran's mark-up.

Another one of Curran's proposed "cures" was "Specially Energized water," which he said had the "same Synergistic healing properties as the water in Lourdes, France." The water was actually distilled water Curran ran through a blender. He also sold therapies named hydrotherapy massage, SpectraColor spa, hyperbaric chamber, ionic cleaner, massage capsule, and personal sauna.

Though Curran began his practice as early as 1998, the government's evidence at trial emphasized the years 2003-4, during which period Curran "treated" 340 clients. In each case, Curran performed at least one live blood exam, which in turn led to the

diagnosis of one of the invented ailments listed supra. Each client bought one or more of Curran's treatments for a cost in some instances of more than $10,000. In those two years, Curran made $1.4 million in income doing this kind of evaluation and "treatment" of his clients. Urged by one of his former naturopathy teachers not to pretend to be a medical doctor, Curran responded, "Some people will think I'm a medical doctor, some people won't. I don't care what they think as long as they give me money." He continued, "I'm tired of being broke. I want to make as much money as medical doctors."

As part of his ongoing fraud, Curran made interstate wire transmissions, including a fax to a company which printed one of Curran's misleading pamphlets; an email about the purchase of one of his Ph.D. diplomas; a faxed sales agreement to buy a BioMeridian machine; a faxed application for a line of credit in the name of a parent of one of his clients; and related credit card and credit line transactions involving client payments.

In his defense, Curran testified to believing in all of the methods and products he used and denied any intent to mislead clients about his credentials. He admitted to telling clients "you can't put a price on your health" but also claimed that he regularly told clients that he was a naturopath who had later earned "honorary" and "academic only" M.D. degrees. At sentencing, Curran's counsel submitted letters from fifty-six of Curran's

former clients saying they were happy with Curran's work and/or had not been victims of fraud.

In his appellate brief, Curran states that "[he] does not challenge his conviction but appeals based upon multiple errors related to his sentence."

## Discussion

### I.  Amount of Loss

Curran complains that the district court's calculation of the amount of loss for use in determining his Guideline sentence was excessive.  The court's $1.4 million loss calculation resulted in a sixteen-level increase in Curran's offense level.  USSG § 2B1.1(b)(1)(I)(2005).[1]  Curran contends the loss calculation was based on insufficient evidence, as only a relatively few clients actually testified and the court did not distinguish between services purchased by clients who were taken in by Curran's fraudulent scheme and those, such as the fifty-six who wrote letters expressing satisfaction, who were happy to receive Curran's legitimate alternative therapies and may have sought him out solely as a naturopath.  We find little merit in these contentions.

The government bears the burden of proving a victim's losses by a preponderance of the evidence.  United States v. Acosta, 303 F.3d 78, 82 (1st Cir. 2002).  In calculating loss

---

[1]This Guideline provision section provides a chart for amount of loss exceeding $5,000 and the corresponding mandated point increase in the offense level.

amounts under the Guidelines, a district court evaluates losses stemming from the conduct of conviction and any relevant conduct. United States v. Flores-Seda, 423 F.3d 17, 20-21 (1st Cir. 2005). "Determination of actual loss need not be precise; '[t]he court need only make a reasonable estimate of the range of loss, given the available information.'" United States v. Brandon, 17 F.3d 409, 457 (1st Cir. 1994) (quoting USSG § 2F1.1 cmt. n.8 (1994)) (alteration in original). A court may base a loss estimate on factors including "[t]he approximate number of victims multiplied by the average loss to each victim" and on "[m]ore general factors, such as the scope and duration of the offense and revenues generated by similar operations." USSG § 2B1.1, cmt. n.3(C)(iii) and (iv) (2005). "[T]he district court "may rely on the [Presentence Report], affidavits, documentary exhibits, and submissions of counsel." United States v. Ranney, 298 F.3d 74, 81 (1st Cir. 2002).

We review the district court's interpretation and application of the sentencing guidelines de novo and its factual findings for clear error. Id., 298 F.3d at 81. As Curran acknowledges, a defendant "dissatisfied with the sentencing court's quantification of the amount of loss in a particular case must go a long way to demonstrate that the finding is clearly erroneous." United States v. Rostoff, 53 F.3d 398, 407 (1st Cir. 1995).

a.  District Court's Ruling

The Presentence Report ("PSR") recommended the same loss amount that the district court subsequently adopted.  This was based upon evidence received at the trial, including a summary chart of Curran's office records and exhibits demonstrating the prices paid by clients for Curran's services.  Exhibit 303, the summary chart based on records from Curran's office, was admitted without objection at trial and indicated that between 2000-04, Curran examined almost 500 clients.  In almost every case, Curran conducted a live blood exam which he found to reveal a frightening condition like "parasites" or "red crystals."  More than two-thirds of the clients were found to have parasites in their blood, a diagnosis the court found to be incredible given the unrebutted expert testimony that parasites in the blood are an extremely rare condition, as well, it may be presumed, as the evidence indicating Curran's lack of medical training and qualifications to make such diagnoses and much other evidence of fraud.  The summary chart demonstrated that most patients purchased at least one of the following products:  E-Water, Green Drink, or Silver Water.  Three other trial exhibits, based on the records seized from Curran's office, showed exact dollar amounts spent by 340 clients in 2003-04, a figure which totaled $1,386,429.77 and which the district court rounded to $1.4 million for purposes of discussion at

sentencing.  The total did not include the payments made by patients treated prior to 2003.

As said, the district court followed the recommendation of the PSR in concluding that the amount of loss from Curran's scheme totaled about $1.4 million and, in any event, was "clearly in excess of $1 million."  That latter assessment resulted in a 16-level increase in his offense level.  USSG § 2B1.1(b)(1)(I) (2005).  Curran argues that the amount of loss to his victims was in fact no more than $564,528.67.  He arrives at this number by counting only the amount of money listed in self-reported claims for restitution filed by 108 of his victims.  But the fact that not all the victims sought restitution is not determinative for purposes of calculating the amount of loss.[2]  The court was entitled to conclude from the totality of the evidence, including the comprehensive exhibits mentioned above, that the practices and patterns of conduct described by certain witnesses were followed generally as to Curran's clients, and that all were subjected to fraudulent practices regardless of whether they actively sought restitution.

At sentencing, following a discussion regarding the PSR's loss calculation, the district court made the following ruling:

---

[2]Curran argues that the loss amounts were not subject to adequate adversarial testing pursuant to Rita v. United States, 127 S. Ct. 2456, 2465 (2007), but the loss figures were based on trial evidence, including testimony subject to cross-examination, and Curran could have called relevant witnesses back at the sentencing hearing or submitted new evidence but did not do so.

First and foremost, the Defendant held himself out as having a medical degree. He wore it on his jacket. He had it up on the wall . . . .

And finally, and more precisely with respect to the loss figure here, as it was presented at trial as part of the proof, the Defendant subjected over 300 people to this live blood analysis; and in all of them, as I understood the evidence as it was presented in summary fashion, every single one of those people was told that there was some abnormality with their blood, which, as [government counsel] says, Dr. Crausman says is a statistical impossibility.

And so it is clearly part and parcel of the scam perpetrated by the Defendant in bringing people into his office and then telling them that they were very sick people who needed his services.

We then have the loss figure of $1.4 million. As I say, it is a rounded-up number from the actual number that appears in the pre-sentence report; but it is clearly in excess of $1 million, which is the threshold for the 16-level adjustment pursuant to 2B1.1(b)(1).

Application Note 3(c) only requires the Court to make a reasonable estimate. And here, as I say, the threshold figure for the 16-level increase is one million. Clearly, the evidence that was produced at trial was far in excess of that number, and so I find that the probation officer properly included the 16-level adjustment for a loss amount in excess of $1 million.

b.  Curran's Argument

Curran insists the loss amount is inflated as it includes payments from clients who were not victims of the fraudulent scheme "but instead enjoyed the benefits of the legitimate naturopathic services Curran rendered." He argues that the government needed to submit even more individualized evidence than it did for each victim related to the live blood testing results in order to prove that the victim's payments to Curran for the test and prescribed

-12-

remedies were actual losses to the victim caused by his fraud.  We are not persuaded.  There was ample evidence from which to conclude that Curran falsely held himself out to his clients to be a medical doctor, and that the clients listed in the summary chart were improperly given blood tests and received medically frivolous remedies designed for Curran's financial benefit rather than his clients' well-being.[3]  That a few clients later relayed their satisfaction with this fraudulent treatment through defense counsel is immaterial in light of the clear evidence of professional impropriety and fraud, affecting all his clients, that permeated Curran's practice.

Curran complains that the Guidelines "offer little direction" in how to determine who were actual victims for purposes of assessing the loss total.  "Victim" is defined in the application notes to § 2B1.1 in part as "any person who sustained any part of the actual loss determined under subsection (b)(1). . ." (Nov. 2005).  Actual loss is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense."  USSG § 2B1.1, comment n.3(A)(i) (Nov. 2005).  Pointing to language in the Guidelines establishing a causation requirement

---

[3]Curran argues that it is not proven that the blood testing led directly to the purchase of additional treatments.  But it was more than reasonable for the district court to conclude otherwise, based on the evidence of Curran's terrifying and improbable diagnoses of strange blood problems, as well as much other evidence of associated fraud.

in assessment of loss, USSG App. C, amend. 617, (Nov. 1, 2001), Curran argues that a causal link was not shown between the fraud and the victims payments.  That amendment states that:

> The amendment defines "actual loss" as the "reasonably foreseeable pecuniary harm" that resulted from the offense.  The amendment incorporates this causation standard that, at a minimum, requires factual causation (often called "but for" causation) and provides a rule for legal causation (i.e., guidance to the courts regarding how to draw the line as to what losses should be included and excluded from the loss determination).  Significantly, the application of this causation standard in the great variety of factual contexts in which it is expected to occur appropriately is entrusted to sentencing judges.

Id.

We see no definitional problem.  Given the proof of Curran's misrepresentation as to his medical qualifications and of his fraudulent practices, including the questionable tests and treatments he provided, the court could properly find that the payments made by the clients fell well within the Guidelines' definition of actual loss, to wit, reasonably foreseeable pecuniary harm that resulted from the offense.  USSG § 2B1.1, cmt. n.3(A)(i). The court found that Curran's actions and services were all part and parcel of his "scam" designed to scare the clients into spending money.  It was reasonable to conclude that the patients' payments to Curran for those services were actual losses resulting from the offense and that they were victims. We see no discrepancy between the court's loss findings and the loss and causation standards in the Guidelines.

-14-

Curran relies on two cases which were remanded for resentencing after a district court included non-causal factors in its assessment of the loss. See United States v. Olis, 429 F.3d 540, 547 (5th Cir. 2005); United States v. Rothwell, 387 F.3d 579, 583 (6th Cir. 2004). Both cases are factually distinguishable. Neither involves anything close to the present entwined situation, in which Curran's charges for the tests and medications were shown to be inextricably linked to his misrepresentations, malpractice and fear-mongering.

Curran argues the government needed to prove client by client that the live blood test results were the but-for cause of each of the clients' payments, but, as the court noted, the scheme "involved a number of fraudulent actions and representations," not just the live blood testing. The live blood testing, although a common thread, was, the court said, part of the larger "scam perpetrated by the Defendant in bringing people into his office and then telling them they were very sick people who needed his services." And there was evidence at trial that Curran, not being a doctor, was not authorized by state law to perform or evaluate such a test, as well as that it was rare for parasites to be found in anyone's blood. Curran's test results were described by one doctor as "gibberish." Curran contends the court erred in accepting the government's argument that it was statistically impossible for all the clients to have had something wrong with

their blood since the clients were self-selecting and more likely to be ill because they were seeking therapy. But this contention is sheer speculation as to the facts at hand, unsupported by any medical or other evidence. On this record, we can see no need for any more refined or individualized loss calculations than those supplied to support the district court's "reasonable estimate of the range of loss, given the available information." Brandon, 17 F.3d at 457 (citation omitted).

Curran insists that the loss amount should at least be discounted by the amount spent by some clients for "legitimate" naturopathic therapies. But Curran held himself out to all comers as a licensed medical doctor, not simply a naturopath. Curran's scheme, which included his advertising himself as a medical doctor and telling clients they had all manner of rare blood diseases or the like, could be found to be intended to defraud all comers. There is little evidence to suggest a separate class of clients who understood he was not an M.D. and came to him simply in his capacity as a naturopath. Moreover, the comment in notes accompanying USSG § 2B1.1 states that in cases

> involving a scheme in which . . . services were fraudulently rendered to the victim by persons falsely posing as licensed professionals . . . loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

Id. cmt. n.3(F)(v) (2005). The Sentencing Commission noted that "the seriousness of these offenses and the culpability of these

offenders is best reflected by a loss determination that does not credit the value of the unlicensed benefits provided."  U.S. Sentencing Guidelines Manual app. C, vol. II, amend. 617, at 183-84 (2003).  Thus, even supposing such services as the "full body assessment" provided some naturopathic benefit, or at least were believed by some clients to have done so, no credit is available under the Guidelines for them where Curran was falsely posing to be a licensed medical doctor at the time.[4]  It is true there were fifty-six former clients who submitted letters through defense counsel expressing apparent satisfaction with their treatment by Curran, but even, arguendo, were we to make the doubtful assumption that these fifty-six should somehow be excluded from the loss calculation, Curran concedes the loss amount would still exceed the $1 million upon which his sentence rested.

## II.  Number of Victims

Curran argues that the district court erred in concluding that the scheme involved more than 250 victims for purposes of the separate six-level sentencing enhancement under USSG § 2B1.1(b)(2)(C) (2005), asserting that there was an insufficient causal link between the victims identified and the loss.[5]  This

---

[4]Furthermore, the full body assessment included the live blood test for which Curran was not licensed and which played a role in the fraud designed to scare clients into buying products and "cures."

[5]The provision reads in relevant part:  If the offense-- . . . (C) involved 250 or more victims, increase by **6** levels"

claim is largely a mere repetition of the argument just discussed.

The relevant commentary in the Guidelines defines a "victim" as

"any person who sustained any part of the actual loss determined

under subsection (b)(1)." USSG § 2B1.1, cmt. n.1.  As in the

calculation of loss, we find no error in the court's calculation of

the number of victims.  The court's ruling was as follows:

> For the same reasons, essentially, as the Government
> argued with respect to the loss amount, the Government
> introduced in this case evidence that there were in
> excess of 250 people who were subjected to the live blood
> analysis and told that there were abnormalities, clearly
> the evidence in the case supports the adjustment of six
> levels up.

Curran focuses here on the court's reference to the live blood

analysis, arguing again that it was improper to tie the purchase of

products to the results of the live blood analysis.  But as said,

Curran's argument overlooks that Curran fraudulently presented

himself as a medical doctor to his clients in his nameplate, his

business cards, his attire.  The blood analyses were inextricably

linked to the entire fraud.  There was no error in the court's

ascertainment of the number of the victims.

III.  Restitution

Curran argues, for the first time on appeal, that the

court's restitution order in the amount of $1,425,061.62 was in

error because of what he calls the absence of a causal link between

the criminal offense and the loss amount.  He did not raise this

---

(emphasis in original).  USSG § 2B1.1(b)(2)(C) (2005).

argument below and concedes that any review by our court should be for plain error only. The government contends that Curran has waived this argument altogether and that we should not consider it at all. See United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002) ("A party waives a right when he intentionally relinquishes or abandons it. This is to be distinguished from a situation in which a party fails to make a timely assertion of a right-what courts typically call 'forfeiture.'" (internal citation omitted)). As discussed infra, we hold the claim was waived, although the outcome would be the same were we to review for plain error.

Section 3663A(a)(1) of the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A (2000), requires a district court to order a defendant to make restitution to the victim, defined in section 3663A(a)(2) as a "person directly and proximately harmed as a result of the commission of the offense for which restitution may be ordered." After the August 25, 2006, sentencing hearing, the district court held a November 16, 2006, restitution hearing. The court noted that the separation of the two hearings had allowed the government to prepare a complete list of victims to whom restitution was due and also permitted Curran time to provide information for the restitution calculation regarding clients to whom he claimed he had made refunds. At the restitution hearing, defense counsel conceded he had not supplied government counsel

-19-

with any names of refund recipients and would not press the point at the hearing.  Asked if he had any objection to the government's proposed list of victims and amounts of restitution, defense counsel stated:

> I do not have any specific objections as to any amounts or anything of that nature.  I would press an objection that my client and I had just spoken about in terms of we had received a number of letters and statements from former clients who had indicated that, even though they were on this list of summary of victims, they did not want to be considered victims for purposes of restitution . . .
>
> In my research of the statute and speaking to the Court, it's my understanding that it doesn't matter whether they want to be considered victims or not, the statute is denominated a mandatory victim restitution statute and that if they don't want the money when it comes in, apparently the procedure is for them to either remit it back to the Government to be put into the general fund for victims or something of that nature.
>
> So I just did not want to lay that objection on the record that it seems nonsensical that someone that doesn't want to receive money as a victim is forced to receive money or forced to transfer it over to a general fund for victims; but if that is, in fact, the case, then I certainly have nothing--

(emphasis supplied).

In his reply brief on appeal, Curran argues that he never waived "his right to contest the issue as to whether the people in the restitution calculation were directly and proximately harmed as a result of the offense," claiming that he did not concede that the pool of victims was properly cast.  The difficulty with this argument is that, when asked at the outset by the court, "Do you have any objection to the proposed list of victims and amounts of

restitution that the Government filed on Monday?" (emphasis supplied), defense counsel plainly stated that he did not have "any specific objections" to "any amounts or anything of that nature." To be sure, he then went on to allude to pressing an objection based upon letters from "former clients" who said they did not want to be considered victims. But he did not withdraw his earlier statement of non-objection and never thereafter lodged an actual objection. Instead, referring to his legal research on the subject, he said he understood that "it doesn't matter whether they want to be considered victims or not" and "did not want to lay that objection upon the record." The upshot appeared to be that he accepted that the statute provides for mandatory restitution regardless of the preference of the victims. See United States v. Johnson, 378 F.3d 230, 244-45 (2d Cir. 2004) ("[A] district court may--indeed, must--impose orders of restitution on defendants convicted of crimes identified in the MVRA even if their victims decline restitution."). Counsel concluded that "if that is, in fact, the case, then I certainly have nothing." Given that Curran was granted an explicit opportunity below to object to the proposed list of victims, affirmatively stated he had no objections, and did no more than express frustration over the existing state of the law, we hold he waived any right to contest the victims' list on appeal. To hold otherwise would be to allow counsel to withhold

matters from consideration by the district court only to use them on appeal.

Curran, moreover, would fail on this point even if it were now reviewed for plain error. As in the case of calculation of loss, "absolute precision is not required in calculating restitution under the MVRA." United States v. Mahone, 453 F.3d 68, 74 (1st Cir. 2006) (citation omitted). "[O]nly a modicum of reliable evidence is required to establish a restitution award." Id. (citation omitted). As noted supra in the discussion of the amount of loss and number of victims, Curran concocted a scheme predicated on holding himself out falsely as a doctor and conducting bogus tests and therapies for which he charged his clients large sums. The evidence is well-established as to the identity of the clients and the amounts charged to each.

Curran quotes from United States v. Vaknin, 112 F.3d 579, 590 (1st Cir. 1997), for the proposition that the restitution analysis requires an "individualized inquiry; what constitutes sufficient causation can only be determined case by case, in a fact-specific probe." The situation in Vaknin, however, was factually distinguishable from the present. The evidence here does, indeed, reflect a "fact-specific probe." The court in the instant case based its analysis on very substantial record evidence (far exceeding a mere "modicum"), which included summary charts of the prices paid by hundreds of Curran's clients for the fraudulent

services received, as well as extensive evidence, and a jury verdict, establishing the overall fraud. Defense counsel made no effort to highlight any deficiencies in the court's calculations and in fact did the opposite by stating that he did not "have any specific objections as to any amounts or anything of that nature." Even had any objection not been waived, the court's restitution ruling came nowhere near meeting the plain error standard. See United States v. Olano, 507 U.S. 725, 732 (1993) (showing of plain error requires an obvious error that affects the defendant's substantial rights and that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings") (citations omitted) (alteration in original).

IV. Sixth Amendment Claim

Curran lastly makes what he concedes is a futile argument that the district court violated his Sixth Amendment rights by applying sentencing enhancements not found by the jury and based on a preponderance of the evidence standard rather than beyond a reasonable doubt. We have repeatedly rejected this argument and do so again in this case. See, e.g., United States v. Pizzara-Berrios, 448 F.3d 1, 6 (1st Cir. 2006).

**Affirmed**.