# United States Court of Appeals
## For the First Circuit

No. 21-1355

UNITED STATES OF AMERICA,

Appellee,

v.

MIGUEL FRANCISCO CARRASQUILLO-VILCHES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Thompson, Selya, and Kayatta,
Circuit Judges.

Stephen V. Manning, with whom Spears Manning & Martini LLC
was on brief, for appellant.
Maarja Tiganik Luhtaru, Assistant United States Attorney,
with whom W. Stephen Muldrow, United States Attorney, Mariana E.
Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate
Division, and Gregory B. Conner, Assistant United States Attorney,
were on brief, for appellee.

May 2, 2022

**SELYA**, **Circuit Judge**. This is a case in which defendant-appellant Miguel Francisco Carrasquillo-Vilches, an apparent apostle of audacity, has traveled a winding road that led him from the finagled occupancy of an upscale apartment to a prison cell. Following the defendant's guilty plea to charges of falsely impersonating a federal officer and wire fraud, the district court imposed five concurrent eighteen-month terms of immurement and ordered restitution in the amount of $30,605.19. The defendant appeals, challenging both the sentence and the restitution order. After careful consideration, we affirm his sentence and affirm all but a sliver of the restitution order.

## I. BACKGROUND

We briefly rehearse the relevant facts and travel of the case. "Because this appeal 'follows a guilty plea, we glean the relevant facts from the change-of-plea colloquy, the unchallenged portions of the presentence investigation report (PSI Report), and the record of the disposition hearing.'" United States v. Merced-García, 24 F.4th 76, 78 (1st Cir. 2022) (internal quotation omitted) (quoting United States v. Dávila-González, 595 F.3d 42, 45 (1st Cir. 2010)).

In July of 2019, the defendant moved from Tennessee to San Juan, Puerto Rico. Prior to moving, he contacted a local realtor to assist with his search for a residence. The realtor

put the defendant in contact with a prospective landlord, who had an upscale apartment for rent.

Negotiations ensued. The defendant wanted a provision in the lease that would allow him to terminate it at any time without incurring financial liability. Believing that such an early-termination provision would more readily be made available for certain functionaries of the federal government, the defendant falsely identified himself as an employee of the United States Department of Homeland Security (DHS). Specifically, he referred to himself as "Director Tactical Command of the Mid-South Region for the Homeland Security Investigations agency."

To add a patina of plausibility to his falsehoods, he generated what appeared to be a chain of emails between his personal email address and a doctored DHS email address and displayed this bogus email chain to both the realtor and the prospective landlord. These emails gave the appearance that DHS was aware of the defendant's plan to lease an apartment and was in the process of issuing a formal approval of that plan.

When he submitted his rental application, the defendant falsely represented that he would be entering the lease on behalf of DHS and that he would be the employee who occupied the premises. The application, he said, was "authorized by Bill Whitaker, Sub-Director of DHS." For aught that appears, Whitaker was a figment of the defendant's imagination.

Even though several of the defendant's representations were spurious, his rental application was approved and a twelve-month lease agreement (the Lease) was executed. The Lease bore the signatures of the landlord, the defendant, and what appeared to be the authorizing signature of a DHS official (which the defendant apparently forged). The Lease ran from July 15, 2019 to July 14, 2020 and identified DHS as the lessee, the defendant as the occupant, and the landlord as the lessor. The Lease provided for rent of $7,500 per month, reflecting a total contract price of $90,000 for the twelve-month term. It also provided for the immediate delivery of a security deposit in the amount of $7,500.

At the defendant's instance, the Lease contained a "Diplomatic Clause." This clause made DHS liable for any rent that might remain unpaid should the defendant vacate the apartment before the expiration of the Lease. During a later interview with the probation officer, the defendant indicated that he wanted this clause in the Lease because he planned to return to Tennessee in or around December of 2019. DHS, of course, knew nothing about the Lease and had no knowledge of the "Diplomatic Clause."

The defendant occupied the apartment for the first two months of the term of the Lease without either delivering the security deposit or paying the rent. Blaming nonpayment on processing delays at DHS, the defendant sent the landlord a

personal check for the overdue amounts ($22,500). The check bounced and was returned to the landlord for insufficient funds.

The landlord complained to the realtor, and the realtor belatedly submitted an inquiry to DHS regarding the defendant's employment status and DHS's role in the Lease. Another month went by: the defendant continued to reside in the apartment and the rent continued to go begging.

By this time, the landlord's patience was exhausted and he brought an eviction proceeding against the defendant in the Puerto Rico Court of First Instance. During that proceeding, the defendant admitted to owing "almost $30,000" but continued to lie about his employment with DHS. He claimed that he expected DHS to issue a check for the arrearage in short order. Unpersuaded, the Puerto Rico court ordered the defendant's eviction, and the defendant vacated the premises.

At around the same time, DHS responded to the realtor's inquiry. Its response made pellucid that the defendant was not a DHS employee and had no authority to enter into the Lease on DHS's behalf.

The scene soon shifted from a civil proceeding to a criminal proceeding. On October 31, 2019, a federal grand jury returned an indictment that charged the defendant with one count of impersonating a federal officer, see 18 U.S.C. § 912, and four counts of wire fraud related to his interstate email communications

with the realtor and the landlord, see id. § 1343. After originally maintaining his innocence, the defendant reversed his field and entered a straight guilty plea to all five counts of the indictment. The district court accepted his guilty plea and ordered the preparation of a PSI Report. In that report, the probation office recommended a total offense level of thirteen, which included a six-level increase for the amount of the intended loss (calculated to be $90,000). See USSG §2B1.1(b)(1)(D). This offense level, coupled with a criminal history category of I, yielded a guideline sentencing range (GSR) of twelve to eighteen months.

The district court convened the disposition hearing on April 13, 2021. The defendant objected to the PSI Report, contending that the amount of loss was overstated. The court overruled the defendant's objection and adopted the guideline calculations limned in the PSI Report. The defendant then urged the court to impose a sentence of probation. For its part, the government urged the court to impose a prison sentence at the top of the GSR.

The court sentenced the defendant to concurrent eighteen-month terms of immurement on each of the five counts of conviction. It also ordered the defendant to pay $30,605.19 in restitution to the landlord. That sum comprised three months of unpaid rent ($22,500), the unpaid security deposit ($7,500), and

the expenses that the landlord incurred in traveling from Florida to Puerto Rico to appear at the eviction proceeding ($605.19). This timely appeal followed.

## II. ANALYSIS

The defendant challenges his sentence as procedurally infirm and substantively unreasonable. In addition, he challenges the restitution order as excessive because it includes (improperly, in his view) the unpaid security deposit and the landlord's travel expenses. We address these challenges sequentially.

### A. **The Sentence**.

Our "review of claims of sentencing error entails a two-step pavane." United States v. Vélez-Andino, 12 F.4th 105, 112 (1st Cir. 2021) (quoting United States v. Matos-de-Jesús, 856 F.3d 174, 177 (1st Cir. 2017)). Thus, "we first determine whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable." United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011). "At both steps of this pavane, our review of preserved claims of error is for abuse of discretion." United States v. Díaz-Lugo, 963 F.3d 145, 151 (1st Cir. 2020). Within the abuse-of-discretion rubric, "we review the sentencing court's findings of fact for clear error and questions of law (including the court's interpretation and

application of the sentencing guidelines) de novo." United States v. Rivera-Morales, 961 F.3d 1, 15 (1st Cir. 2020).

Against this backdrop, we turn to the defendant's claims of error (all of which were preserved below).

1. **The Procedural Claim**. The defendant first asserts that his sentence was procedurally infirm because the district court erroneously applied a six-level increase to his base offense level. This assertion does not withstand scrutiny.

The defendant pleaded guilty both to impersonation of a federal officer and to wire fraud. Because the wire fraud counts called for a higher base offense level (seven) than the impersonation count (six), the former provided the starting point for calculation of the GSR. See USSG §2J1.4(c)(1).

In fraud cases, the amount of loss — actual or intended — is an important integer in the calculation of a defendant's base offense level. USSG §2B1.1 applies in this case, and that guideline calls for graduated increases to the base offense level depending on the extent of pecuniary loss sustained by the victim. See id. §2B1.1(b)(1). For this purpose, "loss" is defined as "the greater of actual loss or intended loss." Id. §2B1.1, cmt. n.3(A).

When calculating the defendant's base offense level, both the PSI Report and the district court focused on intended loss. In relevant part, the applicable sentencing guideline in effect at the time of the defendant's offenses defined "intended

loss" as "the pecuniary harm that the defendant purposely sought to inflict." Id. cmt. n.3(A)(ii)(I). The PSI Report suggested — and the district court found — that the intended loss was $90,000 (the total amount of rent due under the Lease for the full twelve-month term). Because this amount exceeded $40,000, a six-level increase to the defendant's base offense level was in order. See USSG §2B1.1(b)(1)(D).

The PSI Report justified this intended loss calculation in two ways. First, it found that the defendant "purposely sought to inflict" a $90,000 loss on the landlord simply by entering into the Lease. This finding captured the defendant's subjective intent and conformed to the guideline's then-current definition of intended loss. See id. §2B1.1, cmt. n.3(A)(ii). In a subsequent addendum, however, the probation office cited a case interpreting an outdated definition of intended loss, see United States v. Alphas, 785 F.3d 775, 780 (1st Cir. 2015) (applying definition of "intended loss" prior to 2015 guideline amendments), and described the $90,000 amount as a "reasonable and foreseeable loss" in the event of a breach. This description seemed to approach the amount of intended loss from the standpoint of what was objectively reasonable. Even so, that addendum noted that "subjective intent may play some role" and reaffirmed the finding that the defendant never intended to pay anything owed under the Lease. In this regard, it depicted the defendant as a "true con artist."

At sentencing, the government agreed with the PSI Report's bottom-line intended loss determination but predicated it solely on the basis of the defendant's subjective intent. The government argued that the defendant's persistent lies and his failure to pay any of the sums owed under the Lease plainly reflected his intent to fleece the landlord. The defendant objected to the six-level increase, arguing that he never intended to default on the Lease and that the government failed to introduce any evidence to the contrary. He also asserted that, by framing its intended loss calculation in objective terms, the PSI Report employed an incorrect legal standard to arrive at its recommendation for the six-level increase. The district court resolved this contretemps in the government's favor, finding abundant evidence to support the defendant's intention to deprive the landlord of the entire contract price under the Lease.

In this venue, the defendant seizes upon the district court's statement that it agreed "100 percent" with the PSI Report's recommendation for a six-level enhancement. Building on this porous foundation, the defendant suggests that the PSI Report, by portraying the intended loss (in an addendum) as "reasonable and foreseeable," used an incorrect legal standard (that is, an objective standard) to calculate the defendant's intended loss. In the defendant's view, the district court — by announcing its "100 percent" agreement with the PSI Report's recommendation —

adopted this incorrect standard for determining the amount of intended loss.

The defendant's argument draws some nourishment from a 2015 amendment to the sentencing guidelines. Prior to that amendment, "intended loss" under USSG §2B1.1 was determined in this circuit through an objective standard. See, e.g., United States v. Innarelli, 524 F.3d 286, 291 (1st Cir. 2008) (focusing "intended loss" inquiry "on the objectively reasonable expectation of a person in [the defendant's] position at the time" of the offense). But in 2015, the Sentencing Commission amended USSG §2B1.1 to clarify that the "intended loss" inquiry must focus on the degree of "pecuniary harm that the defendant purposely sought to inflict" through his conduct. USSG §2B1.1, amend. 792. Given this amendment, the district court was obliged to use a subjective standard to determine intended loss.

Even so, the defendant's claim that the district court's intended loss determination rests on an objective standard is too much of a stretch. The PSI Report, read as a whole (including the addenda), justified the intended loss calculation in two ways: at various points, it used both a subjective standard and an objective standard in explicating its $90,000 intended loss calculation. Importantly, though, it explicitly described that amount as the "pecuniary loss the defendant purposely sought to inflict." Even if we take the district court's "100 percent" comment literally —

a proposition that we regard as dubious — it would mean that the district court agreed with the probation office that the intended loss, whether measured <u>either</u> from a subjective standpoint or an objective standpoint, was $90,000.

At any rate, the facts on the ground buttress a finding of fraudulent intent. Noting that the defendant spuriously entered the Lease "on behalf of the United States Government," the district court found it "obvious that [the defendant's] intention was not to pay" any amount that became due under the Lease. What is more, nothing in the record compelled the district court to conclude that the defendant had (or reasonably expected to obtain) the funds needed to make the promised payments.

Notwithstanding his apparent shortage of funds, the defendant signed the Lease, falsely representing that DHS would defray the cost. And despite occupying the apartment for a full three months, he never paid the landlord a single cent. He did not even deliver the security deposit. Finally, he gave the landlord a personal check written on insufficient funds. Presented with credible evidence of the defendant's tendency to tell tall tales and presented with no credible evidence suggesting that the defendant (at the time that he entered into the Lease) had any realistic prospect of being able to pay the rent, we cannot say that the district court clearly erred in finding that the defendant never intended to make any payments under the Lease.

Nor does it help the defendant's cause that he told the probation officer that he intended to "pay the rent until the month of December and return to Tennessee" at that time. Assuming without deciding that this statement deserved credence, it is at best a two-edged sword: in light of the evidence establishing the defendant's fraudulent intent, it simply indicates that he intended to occupy the apartment rent-free for a minimum of five months. Applying basic arithmetic, this would mean that the defendant intended to inflict at least $45,000 of pecuniary loss upon the landlord (free-riding with respect to five months' rent and the required security deposit) — an amount that exceeds the $40,000 threshold needed for the six-level increase in his base offense level. See USSG §2B1.1(b)(1)(D).

The defendant balks, arguing that he could not have intended to deprive the landlord of any amount beyond the first few months' rent because his non-payment of the Lease would have prompted a reasonable landlord to evict him and secure a replacement tenant to mitigate the loss. See Imps. Ctr., Inc. v. Newell Cos., 758 F.2d 17, 20-21 & n.3 (1st Cir. 1985) (acknowledging application of mitigation doctrine under Puerto Rico law). But speculation is not proof and, in all events, the defendant's manifest intent to vacate the property after occupying it rent-free for five months stops this argument in its tracks.

The bottom line is that even if we assume for argument's sake that the district court erred in finding that the defendant purposely intended to inflict $90,000 of pecuniary harm on the landlord through his ruse, that error was harmless. See United States v. Tavares, 705 F.3d 4, 26 (1st Cir. 2013) (noting applicability of harmless error doctrine to claims of procedural error). The record amply supports the finding that the defendant subjectively intended to inflict at least a $45,000 loss, which achieves the same six-level enhancement that the district court thought proper. Accordingly, we discern no procedural error.

**2.   The Substantive Claim.**   This brings us to the defendant's claim that his eighteen-month sentence is substantively unreasonable. As indicated above, we review this claim for abuse of discretion. See Holguin-Hernandez v. United States, 140 S. Ct. 762, 766 (2020).

When confronted with a claim that a sentence is substantively unreasonable, our "key inquiry is whether the sentencing court has articulated a plausible rationale and reached a defensible result." United States v. Coombs, 857 F.3d 439, 452 (1st Cir. 2017). Because "reasonableness is a protean concept," United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008), "[t]here is no one reasonable sentence in any given case but, rather, a universe of reasonable sentencing outcomes," Clogston, 662 F.3d at 592. We will vacate a "sentence as substantively unreasonable

only if it lies 'outside the expansive boundaries' that surround the 'universe' of reasonable sentences." Matos-de-Jesús, 856 F.3d at 180 (quoting Martin, 520 F.3d at 92).

This standard typically presents a defendant "with an uphill climb." Coombs, 857 F.3d at 452. That climb is made steeper "where, as here, the challenged sentence is within a properly calculated GSR." Clogston, 662 F.3d at 593. A defendant who seeks to challenge such a within-the-range sentence "must 'adduce fairly powerful mitigating reasons and persuade us that the district judge was unreasonable in balancing pros and cons despite the latitude implicit in saying that a sentence must be reasonable.'" United States v. Madera-Ortiz, 637 F.3d 26, 30 (1st Cir. 2011) (quoting United States v. Navedo-Concepción, 450 F.3d 54, 59 (1st Cir. 2006)).

The defendant strives to persuade us that he has made this uphill climb. He offers a litany of factors that, in his view, should have militated in favor of a lighter sentence. He mentions his college education, his employment history, and his close relationship with his son as evidence supporting his potential for rehabilitation and the low likelihood of recidivism. He also marshals statistics suggesting that defendants convicted of arguably similar offenses in the District of Puerto Rico often received sentences of probation.

We are not convinced. A defendant cannot simply cherry-pick mitigating factors which, viewed in isolation, might support a lighter sentence and ignore the remainder of the relevant factors (including aggravating factors). In setting forth the reasons for its sentence, the district court noted that it had considered all of the sentencing factors set forth in 18 U.S.C. § 3553(a) and specifically discussed some of the mitigating factors. It then recounted the course of mendacity that the defendant employed in perpetuating his "scheme to defraud." The district court also remarked that the defendant had made false representations concerning his employment to the Puerto Rico court during the eviction proceeding. And, finally, the district court stated that the defendant's case was unique in its experience: it was unaware of any other case involving the impersonation of a federal officer in order to commit wire fraud. Based on this case-specific assessment of the sentencing factors, the district court determined that a sentence at the top end of the GSR appropriately "reflect[ed] the seriousness of the offenses, promote[d] respect for the law, protect[ed] the public from further crimes by [the defendant], and addresse[d] the issues of deterrence and punishment."

The district court's analysis constituted a plausible rationale for the sentence imposed. The defendant showed himself to be a persistent purveyor of prevarications, who brazenly assumed

the mantle of a federal officer for his own comfort and convenience, depriving an innocent third party of the rent for which he had bargained. That the district court — in reaching this conclusion — weighed the evidence before it differently than the defendant would have preferred "does not undermine the plausibility of [its] rationale." Coombs, 857 F.3d at 452.

The sentence also represented a defensible result. To begin, a sentence — like this one — that falls "within a properly calculated guideline sentencing range is entitled to significant weight." United States v. Angiolillo, 864 F.3d 30, 35 (1st Cir. 2017); see Rita v. United States, 551 U.S. 338, 347 (2007). That weight is determinative here, given the severity of the offenses of conviction. Falsely identifying oneself as a federal officer in order to dupe another party into offering favorable contract terms is serious business, inviting serious punishment. Examining the record as a whole, the sentence imposed was "responsive to the nature and circumstances of the offense, the characteristics of the offender, the importance of deterrence, and the need for condign punishment." Matos-de-Jesús, 856 F.3d at 180. And, thus, we find the sentence well within "'the expansive boundaries' that surround the 'universe' of reasonable sentences." Id. (quoting Martin, 520 F.3d at 92).

## B.    **The Restitution Order**.

The defendant's remaining tranche of challenges targets the calculation of the district court's restitution order. "We review restitution orders for abuse of discretion, examining the court's subsidiary factual findings for clear error and its answers to abstract legal questions de novo." United States v. Chiaradio, 684 F.3d 265, 283 (1st Cir. 2012).

Under the Mandatory Victims Restitution Act (MVRA), defendants convicted of certain federal crimes — including (as relevant here) those "committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii) — must make restitution to their victims to compensate the victims for their actual losses, see United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018). An "actual loss" in the MVRA context "is 'limited to [the] pecuniary harm that would not have occurred but for the defendant's criminal activity.'" United States v. Simon, 12 F.4th 1, 64 (1st Cir. 2021) (alteration in original) (quoting Naphaeng, 906 F.3d at 179). For this purpose, intended loss will not suffice. See Naphaeng, 906 F.3d at 179.

Appellate courts do not demand absolute precision in the fashioning of restitution orders. See Simon, 12 F.4th at 64. As long as a district court's restitution "order reasonably responds to some reliable evidence, no more is exigible." United States v.

Sánchez-Maldonado, 737 F.3d 826, 828 (1st Cir. 2013); see Simon, 12 F.4th at 64-65.

In the case at hand, the defendant posits that the district court doubly erred in compiling its restitution order: first, by ordering restitution for the unpaid security deposit; and second, by ordering restitution for the landlord's travel expenses incurred in connection with the eviction proceeding.[1] We treat each claim of error separately.

1. **The Security Deposit**. At the commencement of the Lease, the defendant was obligated to deliver a security deposit of $7,500. The defendant never fulfilled this obligation, and the district court included the amount of the security deposit as part of the landlord's actual loss. The defendant challenges this ruling, alleging that the inclusion of this amount provides the landlord with a windfall. In support, the defendant adverts to a provision in the Lease that, in substance, requires the return of the security deposit to him at the termination of the Lease except to the extent that the deposit (or some part of it) is needed to defray rent arrearages or claims for damage to the demised premises. The record contains no evidence of any damage to the premises and — the defendant submits — allowing the landlord to

_____

[1] The defendant does not challenge that portion of the restitution order that requires him to pay the landlord $22,500 in back rent.

- 19 -

recover all three months of unpaid rent and to keep the security deposit without applying it toward the unpaid rent would unjustly enrich the landlord.

As a general matter, restitution orders should not generate windfalls. After all, the principal goal of restitution is "to make the victim whole again," Innarelli, 524 F.3d at 293, and "an order for restitution ought not to confer a windfall upon a victim," Naphaeng, 906 F.3d at 179.

Here, however, there was no windfall. Pertinently, the Lease provides: "In the event that [the lessee] leaves the property before the end of the [Lease], the Security Deposit[] will not be returned to [him]." Given this provision, we are satisfied that the inclusion of the security deposit in the restitution order reflects a reasonable response to reliable record evidence. See Sánchez-Maldonado, 737 F.3d at 828. The defendant was evicted from the apartment before the Lease terminated and the provisions of the Lease permitted the landlord to retain the security deposit upon an early departure, whether voluntary or involuntary. The district court, therefore, did not abuse its discretion by including the amount of the security deposit in its restitution order.[2]

_____

[2] The defendant suggests that the government did not develop this argument below, but the record belies this suggestion. The government introduced the Lease as a sentencing exhibit and underscored the provision permitting the landlord to retain the

**2.  The Travel Expenses**.  The inclusion of the landlord's travel expenses in the restitution order is a horse of a different hue.  The record discloses that the landlord incurred $605.19 in expenses traveling from Florida to Puerto Rico in order to prosecute an eviction proceeding against the defendant in the Puerto Rico Court of First Instance.  At the government's urging, the district court found these expenses to have been incurred in a "proceeding[] related" to the defendant's criminal prosecution, see 18 U.S.C. § 3663A(b)(4), and included them in the restitution award.

After this appeal was docketed, the government had second thoughts.  In its brief, it conceded that the MVRA did not authorize the inclusion of these travel expenses in the restitution order.  This concession was appropriate:  the MVRA, in relevant part, provides that a restitution award shall require a defendant to "reimburse the victim for . . . transportation[] and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  See id.  The Supreme Court has held that — for such transportation expenses to be includable in a restitution award — the "proceedings related to the offense" must be criminal in

_____

security deposit in the event of early departure.  And in all events, "[w]e are at liberty to affirm a district court's judgment on any ground made manifest by the record."  United States v. George, 886 F.3d 31, 39 (1st Cir. 2018).

nature.  See Lagos v. United States, 138 S. Ct. 1684, 1687 (2018). The travel expenses at issue here were not incurred in connection with a criminal proceeding but, rather, in connection with a civil eviction proceeding.  Thus, we agree with the parties that those expenses do not fall within the reach of the MVRA.

Even so, the government's brief attempted to resurrect the award of travel expenses by arguing — for the first time — that the travel expenses were appropriately included as a function of the district court's general sentencing discretion.  This argument, though, withered on the vine.  In a post-briefing letter, see Fed. R. App. P. 28(j), the government withdrew the argument. We treat a withdrawn argument as waived.  See United States v. Padilla-Galarza, 990 F.3d 60, 87 (1st Cir. 2021).

That ends this aspect of the matter.  The claim for travel expenses has been waived.  And in any event, the Lagos Court's reading of the MVRA, see 138 S. Ct. at 1687, is clear. Because the travel expenses were improperly included in the restitution award, that award must be reduced by the amount of those travel expenses ($605.19).

**III. CONCLUSION**

We need go no further.  For the reasons elucidated above, we affirm the defendant's sentence, affirm the restitution order except as to the inclusion of the travel expenses ($605.19), and

remand for the entry of an amended restitution order consistent with this opinion.

**So Ordered**.